Franz–Josef **KORTÜM** and **Webasto AG Fahrzeugtechnik, Plaintiffs,**

v.

**WEBASTO SUNROOFS INC.,**
**a Delaware corporation,**
**Defendant.**

**Civil Action No. 17237.**

Court of Chancery of Delaware.

Submitted Oct. 15, 2000.

Decided Feb. 9, 2000.

Michael D. Goldman, James F. Burnett, and Eileen M. Filliben, of Potter, Anderson & Corroon, Wilmington, Delaware, and Lawrence D. Pringle and James V. Parravani, of Dorsey & Whitney LLP, New York, New York, for Plaintiffs.

Samuel A. Nolen, Catherine G. Dearlove, Megan Semple Greenberg and Kelly A. Herring, of Richards, Layton & Finger, Wilmington, Delaware, for Defendant.

*OPINION*

JACOBS, Vice Chancellor.

This action is brought by a director and a 50% stockholder of a joint venture Delaware corporation to inspect the corporation's books and records under 8 *Del. C.* § 220. Two issues are presented. The first is whether the inspection rights of the director—which otherwise are conceded to be absolute—may be limited by ordering the director not to disclose those records (or information derived therefrom) to the 50% stockholder that designated the director as a board member. The second issue is whether the plaintiff stockholder's stated purpose for inspection is *bona fide,* and if so, whether the scope of inspection relief should be limited because of the possibility of conflicting interests between that 50% stockholder and the corporation.

I conclude, in this post-trial Opinion, that (1) the plaintiff-director's inspection rights should be unrestricted, and (2) that the plaintiff-stockholder, whose purpose for seeking inspection is *bona fide,* should have the same inspection rights as its director-designee, but subject to certain limiting conditions applicable to both plaintiffs.

## I. FACTS

Many of the facts critical to a resolution of this controversy are undisputed, but where they are disputed the facts are as found below.[1]

### A. The Parties and their Relationships

The Delaware corporation that is the subject of this dispute is Webasto Sunroofs, Inc. ("WSI"), a company that is engaged in the business of manufacturing, marketing, selling, and distributing sunroofs to the automotive industry in North America. WSI is a joint venture formed under a shareholders agreement dated May 1, 1984 (the "Shareholders Agreement") between plaintiff Webasto AG Fahrzeugtechnik ("WAG") and a subsidiary of Magna International, Inc. ("Magna").[2] WSI employs approximately 900 people and in 1998 it had net sales of approximately $201 million.

WAG and Magna each owns 50% of the equity of WSI, and each stockholder designates three of WSI's six directors. One of WAG's director-designees is plaintiff Franz–Joseph Kortüm ("Kortüm"), who is WAG's Chief Executive Officer. WAG and Kortüm are the plaintiffs in this action.

1. The factual summary narrated in this portion of the Opinion is not intended to be exhaustive. Other facts are set forth in the Analysis Section (Part III), where appropriate.

2. The Magna subsidiary is Cosma International of America, Inc. ("Cosma"). Except where otherwise stated, Magna and Cosma are referred to in this Opinion as "Magna," and any references to Magna include Cosma.

The defendant is WSI, but only nominally. The true respondent is Magna, the other 50% stockholder that controls WSI on a day-to-day basis and that is presently embroiled in this dispute with WAG.

The Shareholders Agreement governs the relationship between the two stockholders. Under that Agreement, WAG is to provide technical support to WSI in accordance with certain license agreements, and Magna is to provide management services under a management agreement dated as of August 1, 1984 ("Management Agreement").[3] Under the Management Agreement, Magna has been exercising day-to-day control over WSI's operations, and is presently exercising control over WSI's position in this litigation.[4] But, and as WSI (Magna) concedes in its brief, for the last fifteen years WAG, through its director-designees, has "participate[d] in decision making regarding the operation, strategy and financial condition of WSI."[5] The record shows that significant financial and other information has been routinely furnished to WAG and Magna. WAG contends, however, that much of that information is not provided to it on a regular basis or in the same detail as is provided to Magna. What is clear is that Magna, by virtue of its day-to-day control of WSI, controls access to those books and records and is now using that control to deny similar access to the other 50% stockholder and co-venturer, WAG. That denial of access

is what has prompted the institution of this § 220 proceeding.

## B. Events Leading to the Demand for Inspection

Although WAG's motives for seeking inspection of WSI's books and records are disputed, the underlying background facts are not. Until 1998 the two co-venturers' relationship was more or less harmonious. In 1998 two events occurred, and from that point on the relationship between WAG and Magna deteriorated. The first event was Mr. Kortüm's ascendancy as CEO of WAG and his insistence upon more adequate reporting of information to WAG. The second was WSI's 1998 year end reported profits of only $2.1 million—a 90% downward variance from the $21 million in profits that WSI had previously budgeted. Concerned about that development, Horst Winter, Executive President of WAG and a director of WSI, wrote WSI a letter requesting detailed explanations for that downward variance. That letter was hand delivered at a meeting between Magna and WAG representatives held in Munich, Germany, in February, 1999. At that meeting, Kortüm stated that he and WAG were dissatisfied with the quality of WSI's financial reporting and its explanation for the variances, and took the position that more detailed explanations were required. At that meeting Magna representatives responded that the books of WSI were fully open to WAG at any time, and they agreed to let WAG conduct an audit of WSI.

---

**3.** On July 1, 1998, Magna's rights and responsibilities under the Management Agreement were assigned to a subsidiary, Atoma International Corp. ("Atoma"). Again for ease of reference, unless otherwise noted, any references to Magna should be understood as including Atoma.

**4.** The response to plaintiffs' demand letter of May 31, 1999 was signed by Atoma, as "agent" for WSI; moreover, WSI is repre-

sented in this proceeding by the same counsel that represents Magna in a pending proceeding filed by WAG to dissolve WSI pursuant to 8 *Del. C.* § 273. To signal the fact that the litigating positions being taken by WSI are in reality positions taken by Magna, WSI is sometimes referred to in this Opinion as "WSI (Magna)."

**5.** WSI Answering Post–Trial Brief at 5.

Shortly thereafter, while WAG was arranging with Magna to conduct the audit, WAG was told that Magna would not allow the audit to take place.

Magna (through WSI) does not deny that these events occurred, but contends that WAG's claimed need for more information was and is pretextual. WAG's real purpose, Magna claims, is to compete directly against WSI in the North American sunroof market, free of any constraints imposed by the joint venture or the Shareholders Agreement. Magna points to several facts that, it claims, compel this conclusion. First, WAG acquired and operates Hollandia Sunroofs, Inc. ("Hollandia"), which markets and distributes sunroofs in the aftermarket industry in the United States. Second, WAG formed a new corporation (Webasto Roof and Body Systems of Lapeer, Michigan) to offer services, products, and engineering technology to its customers in North America. Third, WAG is currently distributing and selling sunroof products (including lamella sunroofs) in North America. Fourth, WAG has excluded WSI from preparing quotations to develop new business from General Motors and Daimler Chrysler. Fifth, and most important, on May 19, 1999, WAG filed an action in this Court under 8 *Del. C.* § 273 to discontinue WSI (the "Section 273 action"), in which WAG has proposed a plan of discontinuance and a distribution of WSI's assets.[6] The Section 273 action is being actively prosecuted.

On May 31, 1999, two weeks after WAG filed the Section 273 action, Mr. Kortüm sent a letter to WSI, pursuant to § 220, in both his capacities as a director of WSI and as Chairman of WAG, demanding to inspect WSI's books and records. Kortüm's stated purpose as a director for seeking inspection was to monitor Magna's performance under the Management Agreement, especially in light of the recent profit variances. WAG's stated purpose as a stockholder was to value its shareholder interest in WSI.[7] It is undisputed that the scope of the requested document inspection is quite broad.[8]

WAG contends that it submitted the May 31 demand letter in response to Mag-

---

6. The Section 273 action is docketed as *In Re Webasto Sunroofs, Inc.*, Del. Ch., C.A. No. 17171.

7. An additional purpose that WAG relies upon is that it was considering financing options, including a public bond issuance, which require an accurate determination of the value of all its assets and investments. That purpose, Magna claims, is personal to WAG and not reasonably related to its interest as a stockholder. *See, Thomas & Betts Corp. v. Leviton Mfg. Co.*, Del. Ch., 685 A.2d 702, 708–10 (1995), *aff'd*, Del.Supr., 681 A.2d 1026, 1033 (1996). Because I find that WAG's stated (valuation) purpose is *bona fide*, and determine the scope-of-inspection question on that basis, I do not reach or consider the issue relating to WAG's second purpose.

8. The demand embraces all WSI books and records, including, but not limited to, the following nine categories: (1) all sales records underlying WSI's audited financial statements; (2) all documents reflecting the nature and value of WSI's assets, including, but not limited to, accounts receivable, inventories of finished goods, raw materials and work in progress, records of WSI property, plant and equipment holdings, records of cash on hand, cash equivalents and other investments, and records of any other WSI assets; (3) records of all WSI obligations and liabilities; (4) all supply contracts, tooling contracts or any other WSI contracts with third-party vendors and/or related entities; (6) all sales projections and/or business plans prepared or reviewed by WSI management; (7) any other financial records of WSI; (8) all information concerning employees of WSI, including, but not limited to, employment contracts, any employee benefit plans or other individual benefit plans, stock option plans, etc.; and (9) any tax balance sheets, tax returns and tax assessments for the last three years and latest WSI tax auditors reports. PX 5.

na having reneged on its undertaking to permit WAG to conduct an audit. Magna (WSI) responds that the demand letter, and this action, are simply a part of WAG's "exit strategy" from the joint venture, and a strategem to enable WAG to obtain sensitive information that WAG will use competitively to WSI's disadvantage. In any event, in response to the demand letter WSI agreed to permit the inspection by Kortüm in his capacity as a director, subject to his written confirmation that he and any advisors would inspect and use the books and records only in that capacity; *i.e.*, he would not disclose them to WAG or to any other third parties. WSI declined, however, to permit any books and records inspection by WAG, citing as reasons WAG's competitive status, the nature of the information WAG was demanding, and the pendency of the Section 273 action.[9]

This proceeding followed. A trial was held on August 4 and August 26, 1999, followed by post-trial briefing and oral argument. This is the Opinion of the Court on the merits of the inspection claims.

## II. THE CONTENTIONS AND THE APPLICABLE LAW

This action involves two separate inspection claims: Kortüm's claim for inspection in his capacity as a WSI director, and WAG's claim for inspection as one of WSI's two 50% stockholders. Those claims implicate separate rights that arise

out of two distinct provisions of § 220 of the Delaware General Corporation Law, provisions that impose different burdens of proof.

### A. Director's Inspection Rights

Regarding the inspection rights of a director, § 220(d) provides that "[a]ny director ... shall have the right to examine the corporation's stock ledger, a list of its stockholders and its other books and records for a purpose reasonably related to the director's position as a director." Once the director makes a § 220 demand that is refused, a *prima facie* showing of entitlement to the documents has been made and the burden shifts to the corporation to show why inspection should be denied or conditioned.[10] As Vice Chancellor Lamb has stated, there is a "presumption that a sitting director is entitled to unfettered access to the books and records of the corporation for which he sits and certainly is entitled to receive what the other directors are given." [11]

In apparent recognition of the broad scope of a director's statutory inspection right, WSI (Magna) conceded in its response to the demand that Kortüm, in his directorial capacity, was entitled to inspect all the documents described in his demand letter. WSI contends, however, that it is entitled to impose conditions that (it asserts) will assure that the inspection will be only in Kortüm's directorial capacity.

9. PX 6.

10. *Intrieri v. Avatex*, Del. Ch., C.A. No. 16335, 1998 WL 326608, Lamb, V.C., Ltr. Op. at 1 (June 12, 1998) (citing *Holdgreiwe v. The Nostalgia Network, Inc.*, Del. Ch., C.A. No. 12914, 1993 WL 144604, Allen, C. (Apr. 29, 1993), Mem. Op. at 5–6) (quoting *Henshaw v. American Cement Corp.*, Del. Ch., 252 A.2d 125, 128–29 (1969)).

11. *Intrieri* at 1; *see also, Milstein v. DEC Insurance Brokerage Corp.*, Del. Ch., C.A. Nos.

17586 and 17587, Lamb, V.C., Bench Ruling Tr. at 3 (Feb 1, 2000) (expressing the "view that the right of a director of a Delaware corporation to inspect, have access to the books and records of the corporation, is quite broad. It has been described by me, and I think others, as essentially unfettered in nature ... [but] ... is limited in the sense that ... the request for information must be for a purpose that is ... reasonably related to the director's position as a director.")

Specifically, in its response to the demand letter, Magna imposed the following restrictions on Mr. Kortüm's inspection:

- a requirement that other persons who will assist in the inspection be identified at least three business days in advance;
- a limitation on other participants to "only those persons who represent you personally in such capacity, and who do not have any other interest or representation which may conflict with the interests of WSI . . .;
- a requirement that Kortüm sign a confirmation that he would be inspecting and using WSI documents only in his capacity as a WSI director, and that any other person who assists in the inspection sign a similar confirmation; and
- an agreement that, by inspecting the documents, Mr. Kortüm would not disclose the information to any third parties, including any competitor or potential competitor, and WAG itself.[12]

Magna also reserved the right to decide what documents Kortüm could copy.

Accordingly, the only issue presented with respect to Kortüm's claimed directorial inspection right is whether any or all of the conditions that Magna seeks to impose are reasonable.[13] I conclude, for the reasons discussed in Part III, *infra*, that with one exception, they are not.

## B. Shareholder's Inspection Rights

The inspection rights of a shareholder are governed by 8 *Del. C.* § 220(c), which pertinently provides:

> Where the stockholder seeks to inspect the corporation's books and records, other than its stock ledger or list of stockholders, such stockholder shall first establish (1) that such stockholder has complied with this section regarding the form and manner of making demand for inspection of such documents; and (2) that the inspection such stockholder seeks is for a proper purpose. . . .

■■■ Thus, unlike the case of a director seeking inspection, a stockholder who seeks inspection under § 220 must prove by a preponderance of the evidence: (a) its compliance with the form and manner of making a demand specified in the statute, and (b) the propriety of its purpose for seeking inspection, *i.e.*, that the purpose is reasonably related to its interest as a stockholder. Once the shareholder demonstrates its entitlement to inspec-

---

12. PX 6.

13. Although WSI (Magna) conceded Kortüm's entitlement to inspect its books and records *subject to the above conditions, in its post-trial brief* WSI reneged on that concession by arguing that Kortüm's stated purpose is not genuine and that his true purpose is both *improper and adverse to WSI's interests.* That argument is untenable, both legally and factually. Legally, Magna is bound by its concession concerning Kortüm's *inspection entitlement, and cannot now be heard to re-*pudiate it. Factually, Magna's argument improperly attempts to attribute WAG's allegedly improper purpose to Mr. Kortüm, acting in his capacity *as a director.* The record shows, however, that Kortüm's stated inspection purpose is to monitor Magna's management per-formance. Given the 90% gap between bud-getcd and actual 1998 earnings that occurred under Magna's stewardship, that purpose is credible. WSI (Magna) concedes that "[t]hrough its designees on the board, WAG participates in decision making regarding the operation, strategy and financial condition of WSI." Def. Ans. Br. at 5. WSI does not explain, however, how Kortüm, or for that matter any WSI director, can make informed decisions on such critical matters without access to WSI's corporate books and records. Accordingly, the only real issue to be decided in connection with Kortüm's inspection right is whether that right is properly subjected to *one or more of the conditions that* WSI (Mag-na) seeks to impose.

tion, it must also show that the scope of the requested inspection is proper, *i.e.*, that the books and records sought are "essential and sufficient" to the shareholder's stated purpose.[14]

In this case WSI contends that WAG has failed to meet its burden in all three respects. That is, WSI argues that (i) WAG did not submit a demand in conformity with the "form and manner" required by the statute, because the demand was not "under oath;" (ii) WAG's stated purpose is not factually *bona fide*, because given the volume and kinds of documents it has already received and because it has no present ability or intent to buy Magna's shares or sell its shares, WAG has no need to inspect WSI's books and records to value its investment. Indeed, Magna argues, WAG's stated purpose is pretextual, since its true objective is to garner as much sensitive, proprietary information as it can to enable it to compete with WSI once the joint venture is dissolved. Finally, WSI (Magna) argues that (iii) inspection would harm WSI and therefore should be denied, but even if WAG can establish its entitlement to inspection, WAG has failed to show that any of the broad categories of documents it seeks to inspect is "essential and sufficient" to its stated purpose of valuing its investment.

These contentions present three issues relating to WAG's inspection rights as a shareholder:

(1) Did WAG submit a demand "under oath" as required by the statute?

(2) Has WAG shown that its stated valuation purpose is, in fact, its true purpose,? and

(3) Has WAG shown that the scope of the inspection it seeks is proper?

For the reasons next discussed, I conclude that WAG's demand was "under oath" within the meaning of the statute, and that its stated valuation purpose is, in fact, its true purpose. I also conclude that Kortüm is entitled to inspect all of the document categories described in the demand, and may disclose those documents to WAG, subject to certain conditions. Accordingly, it becomes unnecessary to, and I therefore do not, reach the issue of whether the documents described in the demand are "essential and sufficient" to WAG's purpose.

## III. ANALYSIS

### A. Kortüm's Director Inspection Claim

As previously noted, because WSI (Magna) has conceded that Kortüm, as a director, is entitled to inspect all the books and records listed in the demand letter subject to certain limitations, the only issue present is whether WSI's proposed limitations are warranted. I conclude that they are not.

 Restrictions on Kortüm's choice of agents to assist him in the inspection might be justified if the proposed agents have interests in conflict with WSI.[15] Magna (WSI) has the burden of demonstrating such a conflict, and has not met that burden. The agents Kortüm antici-

**14.** *Helmsman Management Servs., Inc. v. A & S Consultants, Inc.*, Del. Ch., 525 A.2d 160, 168 (1987); *Thomas & Betts Corp. v. Leviton Mfg. Co.*, aff'd, Del.Supr., 681 A.2d 1026, 1035 (1996) (citing *Helmsman*).

**15.** *See Henshaw v. American Cement Corp.*, 252 A.2d at 125; *Holdgreiwe* at 5–7. WSI (Magna) argues that these decisions warrant

restrictions on Kortüm's choice of agents, but in those cases the agents themselves had conflicts of interest and were actively pursuing activities hostile to the corporation, *i.e.*, a law firm representing individuals who were suing the company and a third party, not otherwise entitled to receive information, actively involved with the company, respectively.

pates using include lawyers, accountants, members of WAG's finance staff, and Horst Winter, who is a director of WSI. None of these agents was shown to be engaging (or preparing to engage) in activities hostile to WSI. Moreover, Magna's claim that WAG is engaged in a campaign to compete with, and thereby harm, WSI, is undercut by the fact that WAG's 50% stock interest in WSI represents 20% of WAG's revenues and 25% of its profits.

■ Nor is it reasonable to condition Kortüm's inspection upon an undertaking not to disclose to WAG any information gleaned from the document inspection. Kortüm is a fiduciary of WSI, but he is a fiduciary of WAG as well. Absent a conflict between those two roles, Kortüm's fiduciary duty would require him to disclose that information to WAG, which is one of WSI's 50% owners. As Vice Chancellor Lamb has stated, ". . . the Court has the power and the discretion to limit [a] director's access to information, but that is a discretion that I would sparingly exercise because, frankly, [the Court is] not the fiduciary charged with duties to the corporation and its stockholders; rather, the director is." [16]

Magna has not established a conflict between Kortüm's two fiduciary roles. Although it claims that WAG intends to compete with WSI in North America to the greatest extent possible, the only evidence of any actual competition with WSI is that Hollandia currently competes in the aftermarket segment—a fact acknowledged by

Mr. Kortüm, who testified that no information received as a result of this proceeding will be shared with Hollandia. With that exception, Magna's other evidence of "competitive threat" is speculative and unpersuasive.

That evidence concerns activities that were not the subject of any protest by or dispute with Magna, until WAG filed the Section 273 dissolution action. Such activities may threaten competition with *Magna*, but not necessarily with WSI. At most Magna has shown that WAG has the infrastructure and potential to compete with WSI in the OEM market at some point in the future. And while that might ultimately occur if WAG prevails in the Section 273 action, that possibility does not prove that WAG is threatening to do so now, or that Magna may justifiably use its day-to-day control over WSI to prevent Kortüm from disclosing the results of his inspection to WAG.[17] For the same reason, WSI's (Magna's) attempt to limit Kortüm's statutory right to make copies of inspected documents is also unwarranted.

Accordingly, Mr. Kortüm's inspection rights shall be unrestricted, except for the self-imposed restriction that no information derived from the inspection will be shared with Hollandia.

## B. WAG's Shareholder Inspection Claim

As earlier noted, WSI (Magna) opposes WAG's inspection claim on the grounds that (i) the demand was not under oath as

---

16. *Milstein* at 4.

17. Magna's insistence that Kortüm not disclose any information obtained as a result of the inspection to other third parties including other potential competitors, is not unreasonable on its face. I perceive no reason why Kortüm would object to such a condition, so long as the nondisclosure obligation does not include WAG or its representatives. Because Magna has not shown any risk that Kortüm intends to disclose the information to anyone other than WAG, however, it must be presumed that Kortüm, as a fiduciary of WSI, will not disclose WSI's proprietary or confidential information to such third parties. Therefore, Kortüm is encouraged, but will not be required, to bind himself to that nondisclosure restriction.

the statute requires; (ii) WAG has not shown that its stated purpose is, in fact, its true purpose; (iii) WAG has not demonstrated that the broad categories of documents WAG seeks to inspect are "essential and sufficient" to its purpose; and (iv) if inspection is allowed, its scope should be limited to protect WSI against competitive harm threatened by WAG.

Because the Court has already determined that Kortüm is entitled to inspect the universe of books and records described in the demand and should not be restricted from disclosing those documents (or resulting information) to WAG, that determination obviates the need to determine whether the documents to be inspected are "essential and sufficient" to achieve WAG's purpose. Consequently, the issues are whether (1) WAG is entitled to inspection relief (specifically, whether the form of its demand is proper and its stated purpose is *bona fide* ), and (2) whether WAG's inspection rights (which would otherwise be coextensive with Kortüm's) should be restricted, and if so, to what extent.

### 1. The Form–of–Demand Issue

■ I first address WSI (Magna's) argument that the demand was not "under oath."

Section 220(b) requires that a stockholder seeking inspection must submit to the corporation a "written demand under oath." WSI contends that the written demand submitted by plaintiffs was not "under oath," because under German law the form of notarization utilized in the demand did not constitute an oath.

18. PX 5 (underscoring added).

19. In its letter responding to the demand for inspection, WSI did not object to the form of the demand; *i.e.,* it did not state that the

During the trial I found that the argument had no merit. Nothing contained in WSI (Magna's) post-trial brief alters that conclusion. On its face the notarization of Mr. Kortüm's signature on the demand shows that the demand was "under oath." The notarization recites as follows:

> Subscribed and sworn to me the undersigned Dr. Eberhard Hatzelmann, Richter am Oberlandesgericht a. D., amtlich besteller Vertreter von Dr. Helmut Gäbhard, Notar in Starnberg, this 28th day of May 1999
> [SEAL] ——————————
> Notary Public

The second page of the notarization recites:

> I hereby certify that this document was signed in my Presence by Mr. Franz–Josef Kortüm, of Kraillinger Straße 5, D–82131 Stockdorf, identified by his official identity card.... [18]

On its face the quoted acknowledgment appears to conform to the requirement that the demand be under oath. The acknowledgment evidences that the demand was signed by Kortüm, whose identity as the signatory is verified, and that the demand was "sworn to and subscribed" before the attesting notary. Nonetheless, at the trial and for the first time in the case, WSI (Magna) took the position that the notarization was insufficient to constitute an "oath" under German law.[19] WSI offered into evidence an affidavit to that effect, which the Court excluded on the grounds that (i) WSI had failed to give notice of its intent to rely on proof of foreign law as required by D.R.E. 202(e), and (ii) if there was a formal defect, it was cured because Mr. Kortüm testified that

demand was formally defective because it was not under oath. PX 6. The plaintiffs were never put on notice that WSI would take this position until the trial.

the statements made in his demand were true and correct.[20]

I conclude that the original demand, while not in the customary form, satisfied the requirements of § 220(b). But even if that conclusion is erroneous, any defect was cured by Kortüm's trial testimony. Accordingly, WSI's objection to the form of the demand is without merit.

### 2. The Bona Fides of WAG's Stated Inspection Purpose

WSI (Magna) next challenges the *bona fides* of WAG's stated purpose. In its demand letter, WAG stated that its purpose for seeking inspection was "to determine the value of its shareholding interest in WSI." It is well established that the purpose of valuing one's shares in the corporation is proper under § 220.[21] In these circumstances the genuineness of that purpose appears self-evident. WAG is a 50% stockholder in a joint venture corporation owned by only one other 50% stockholder. The relationship between those two stockholders is antagonistic, and one of them (WAG) has filed a petition under Section 273 to dissolve the corporation. As part of the Section 273 action, WAG has proposed a plan to liquidate WSI's assets in a private auction limited to the two 50% owners.[22] In its response to WAG's petition, Magna (through its subsidiary, Cosma) asks the Court to dismiss the petition or, alternatively, to conduct a public auction to sell all of WSI's outstanding shares.[23]

Thus, if the Section 273 action proceeds to a conclusion, it is possible that: (1) WSI's assets will be sold to one or perhaps to both stockholders, or (2) all of WSI's outstanding shares will be sold at a public auction. If, however, the Section 273 proceeding is dismissed, WAG would have a strong interest in either selling its WSI shares to Magna or buying Magna's WSI shares. Under any scenario WAG would have a need to value its investment to enable it to make an informed judgment about how much to bid for WSI's assets, or for Magna's WSI shares,[24] or about the price at which WAG should sell its WSI shares. I find that WAG's interest in valuing its WSI shares based on accurate information is both genuine and substantial: WAG's investment in WSI represents 20% of its revenues and 25% of its profits. Whether dissolved or not, WSI will not continue as a joint venture between Magna and WAG.

WSI (Magna) contends, however, that WAG's stated purpose in seeking inspection is not its true purpose because there is no imminent opportunity for WAG to exit its investment.[25] But the facts that no specific offer to purchase or sell is pending

**20.** Tr. 343. Moreover, on August 26, the plaintiffs filed an amended demand; *i.e.*, the identical demand previously submitted, but with a new notarization in the form customarily used in these proceedings. *See* PX 41.

**21.** *See, e.g., CM & M Group, Inc. v. Carroll,* Del.Supr., 453 A.2d 788, 792–93 (1982); *Helmsman Management,* 525 A.2d at 165; *Ostrow v. Bonney Forge Corp.,* Del. Ch., C.A. No. 13270, 1994 WL 114807, Allen, C., Mem. Op. at 28 (Apr. 6, 1994).

**22.** *In Re Webasto Sunroofs, Inc.,* Del. Ch., C.A. No. 17171, Petition for Discontinuance of Corporation and Plan of Distribution; *See* DX 21.

**23.** *Id.* (Response to Petition for Discontinuance and Exhibit B thereto).

**24.** Indeed, at the February 22, 1999 meeting in Munich, WAG expressed an *interest* in purchasing Magna's 50% interest in WSI. PX 3 at WSI000146.

**25.** WSI simultaneously (and somewhat inconsistently) argues that this § 220 proceeding is a part of WAG's covert "exit strategy." *See* Def. Ans. Br. at 2, 21–22.

at this moment and that WAG has not yet decided whether (or not) to purchase or sell, do not—alone and without more—defeat the factual *bona fides* of its valuation purpose. As this Court stated in *Helmsman Management Services, Inc. v. A & S Consultants, Inc.:* [26]

> When a minority stockholder in a closely held corporation whose stock is not publicly traded needs to value his or her own shares in order to decide whether to sell them [and if so, for how much], normally the only way to accomplish that is by examining the appropriate corporate books and records.

That reasoning has additional force where, as here, the shareholder seeking inspection is a 50% owner of the non-publicly held corporation.[27] That fact is of importance because it matters greatly if the stockholder seeking inspection owns 100 shares in General Motors or owns 50% of the shares of a private corporation held by two stockholders. In the latter case, there often is no identifiable corporate interest separate and apart from the interests of the two stockholders or if there is, the interest of the corporation in protecting itself from unwarranted intrusion is considerably diminished. For that reason, in cases such as this, there should be a rebuttable presumption that the 50% shareholder's purpose for seeking inspection is valid. In this case, however, the evidence demonstrates the propriety of WAG's purpose with or without a presumption.

WSI argues that WAG's status as an actual or potential competitor also belies its professed valuation purpose. In this case that argument is, factually and legally incorrect. A stockholder's status as a competitor may limit the scope of, or require imposing conditions upon, inspection relief, but that status does not defeat the shareholder's legal entitlement to relief.[28]

Finally, WSI argues that the pendency of the Section 273 proceeding defeats WAG's inspection right. That also is incorrect. So long as the statutory requirements for inspection relief are satisfied, the mere pendency of another proceeding does not disqualify a party involved in the other lawsuit from inspecting the corporation's books and records.[29] Nor does the possibility that the Section 273 action may result in a public auction disqualify that party. WSI (Magna) argues that if inspection is allowed, WAG will have access to WSI's competitive secrets, which would eliminate any incentives for other bidders, including WAG, to pay for them at a public auction. This argument is flawed in two respects.

---

**26.** 525 A.2d at 165.

**27.** WSI also argues that WAG has already performed a preliminary valuation of its investment, which shows that WAG's stated valuation purpose is pretextual. The argument is unpersuasive, because the preliminary valuation, based on less than complete information, buttresses the credibility of WAG's claimed need to do a more reliable valuation. *See Thomas & Betts Corp.*, 685 A.2d at 713; (shareholder's ability to perform a preliminary valuation based on incomplete information does not warrant denial of inspection of books and records to value shares).

**28.** *See e.g., E.L. Bruce Co. v. State ex. rel. Gilbert.*, Del.Supr., 144 A.2d 533 (1958); *Credit Bureau of St. Paul, Inc. v. Credit Bureau Reports, Inc.*, Del. Ch., 290 A.2d 689 (1972); *Safecard Servs., Inc. v. Credit Card Serv. Corp.*, Del. Ch., C.A. No. 6426, 1984 WL 8265, Walsh, V.C. (Sept. 5, 1984).

**29.** *See, Sack v. Cadence Industries.*, Del. Ch., C.A. Nos. 4747 & 4765, 1975 WL 1962, Brown, V.C. (Apr. 9, 1975) (stockholder entitled to inspect books and records to assist it in deciding how to respond to proposed settlement in pending New York action).

First, many, if not all, of the joint venture's "competitive secrets" are licensed patents and technological trade secrets and know-how developed by WAG. Second, WSI fails to explain why other bidders would be dissuaded if WAG has prior access to those secrets, but would not be if Magna, also a potential bidder, has the same access.[30]

I conclude, for these reasons, that WAG has demonstrated its entitlement to inspection under § 220, and that in these specific circumstances the scope of that inspection will be coextensive with the scope of the inspection granted to plaintiff Kortüm. I turn to the remaining issue, which is whether any conditions upon WAG's exercise of those rights should be imposed.

### 3. Conditions of WAG's Inspection

Many of the arguments that WSI contends defeat WAG's entitlement to inspection are also asserted as grounds for limiting or conditioning the scope of the inspection. To avoid overburdening this already lengthy opinion, I address only the single argument that was not addressed in Section B(2) above. As for the remaining arguments I conclude that for the same reasons they do not defeat WAG's entitlement to inspection, those arguments also should not operate to limit or restrict the scope of WAG's inspection.

■■■ WSI (Magna) contends that if inspection is allowed, it should include only the documents to which WAG would be entitled—and which it has already been provided—under the Shareholders Agreement, i.e., annual budgets, audited annual financial statements, and monthly unaudited financial statements. But the Shareholders Agreement does not contractually limit the information that must be provided to WSI shareholders, nor does it expressly provide for a waiver of statutory inspection rights under § 220. There can be no waiver of a statutory right unless that waiver is clearly and affirmatively expressed in the relevant document.[31]

There shall be one limitation, which shall apply equally to WAG and Kortüm. For the same reasons that Kortüm may not disclose information obtained from the inspection to Hollandia; any other officers, directors, employees or agents of WAG who receive access to such information shall be similarly prohibited. Moreover, and subject to the above condition, any information obtained from the inspection shall be disclosed only to WAG personnel (other than employees or agents of Hollandia), and persons assisting the plaintiffs in the books and records inspection.

### IV. CONCLUSION

Counsel for the parties shall confer and submit a form of order implementing the rulings made herein.

---

**30.** I place little credence in WSI's protestation that Magna has no greater access to WSI's books and records than does WAG. Magna controls the day-to-day operations of WSI, and therefore controls access to WSI's records. Even assuming that Magna has voluntarily chosen not to exercise that control to grant itself complete access, Magna has the ability to do that whenever it chooses. WAG, which owns the same percentage of equity as Magna, does not.

**31.** *See Hintmann v. Fred Weber, Inc.,* Del. Ch., C.A. No. 12839, 1998 WL 83052, Steele, V.C., Mem. Op. at 28 (Feb. 17, 1998); *see also Ostrow* at 30–31.