# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

BAY POINT CAPITAL PARTNERS L.P. )
and BAY POINT CAPITAL )
PARTNERS II, L.P., )
                                       )
                Plaintiffs, ) C.A. No. N21C-03-072 AML CCLD
                                         )
         v. )
                                         )
FITNESS RECOVERY HOLDINGS, LLC, )
                                         )
             Defendant. )

Submitted: August 9, 2021
Decided: November 30, 2021

## MEMORANDUM OPINION

**Upon Plaintiffs' Motion for Judgment on the Pleadings:
GRANTED**

Steven M. Miller, Esquire, K. Tyler O'Connell, Esquire, and Barnaby Grzaslewicz, Esquire of MORRIS JAMES, Wilmington, Delaware and John F. Isbell, Esquire of LAW OFFICES OF JOHN F. ISBELL, LCC, Atlanta, Georgia, Attorneys for Plaintiffs Bay Point Capital Partners, L.P. and Bay Point Capital Partners II, L.P.

Michael A. Weidinger, Esquire, and Megan Ix Brison, Esquire, of PICKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware and Joshua Krakowsky, Esquire of DAVIDOFF HUTCHER & CITRON LLP, New York, New York, Attorneys for Defendant Fitness Recovery Holdings, LLC.

**LEGROW, J.**

The plaintiffs, who are unsecured creditors, seek judgment on the pleadings with respect to breach of contract and declaratory judgment claims against the defendant borrower. The plaintiffs loaned money to the borrower in connection with a contemplated debtor-in-possession loan in a bankruptcy proceeding, and the borrower issued promissory notes memorializing that debt. The maturity date for the promissory notes has passed, but the borrower has not repaid the principal or interest due under the notes.

The borrower concedes the promissory notes are a valid obligation and that the maturity date defined in the notes has passed. The borrower contends, however, that an amendment to the promissory notes executed by the borrower and its secured creditor extended the maturity date and also reduced the interest rate payable under the notes. The only issue before this Court is whether contractual terms requiring the borrower's and the secured creditor's consent in writing to any modification to the notes permits those two entities to amend the notes unilaterally and without the unsecured creditors' consent. Because the promissory notes' plain terms do not waive the unsecured creditors' right to agree to any modification of the agreement, the plaintiffs are entitled to judgment on the pleadings.

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the parties' pleadings and the documents incorporated by reference therein. Plaintiffs, Bay Point

Capital Partners L.P. and Bay Point Capital Partners II, L.P. (collectively, "Bay Point"), loaned a total of $6.5 million[1] to Defendant Fitness Recover Holdings, LLC ("Fitness") in support of Fitness's efforts to raise money to fund a debtor-in-possession loan for the bankruptcy of Town Sports International, LLC ("Town Sports") and its affiliates. Before declaring bankruptcy, Town Sports operated a series of fitness clubs in New York. To fund the contemplated loan, Fitness and a group of lenders entered into a Convertible Promissory Note Purchase Agreement (the "Purchase Agreement") dated October 2, 2020. Under the Purchase Agreement, Peak Credit LLC ("Peak") is the "Requisite Purchaser" and the only secured lender. All the other lenders, or "Purchasers," including Bay Point, are unsecured creditors.

In exchange for the loans, Fitness issued promissory notes (the "Notes") to Bay Point. Those Notes required Fitness to pay interest at a rate of 10% per annum and to repay the principal, plus interest and exit fees, by the "Note Maturity Date." The "Note Maturity Date" was the earlier of (i) December 31, 2020, or (ii) five business days after the maturity date for the debtor-in-possession loan. The Notes also gave Bay Point the option to convert their debt into membership interests in Fitness.[2]

---

[1] Bay Point Capital Partners, L.P. loaned Fitness $5 million, and Bay Point Capital Partners II, L.P. loaned Fitness $1.5 million.

[2] Plf.'s Mot. for J. on the Pleadings (hereinafter, "Plf.'s Mot.") at 2, Ex. 1 § 2.5.

The Notes defined various "Events of Default," which included Fitness's failure to pay the principal and interest by the Note Maturity Date.[3] Upon default, all unpaid principal and accrued and unpaid interest became immediately due and payable, and Bay Point was entitled to interest at 15% per annum on the loans' principal. In addition, Fitness was required to pay all reasonable attorneys' fees and costs Bay Point incurred to enforce its rights and collect amounts owed.[4] Even in an event of default, however, the unsecured creditors' right to repayment remained subordinated to the repayment rights enjoyed by Peak as the secured lender.

Fitness's effort to obtain sufficient financing to acquire Town Sports' assets ultimately proved unsuccessful. Instead, an entity Peak controlled, New TSI Holdings, Inc. ("New TSI"), purchased substantially all Town Sports' assets.[5] Fitness then agreed that its debtor-in-possession financing, including the amounts loaned by Bay Point, would be treated as a loan to New TSI and that New TSI would repay Fitness once the fitness clubs had sufficient funds or New TSI refinanced its

---

[3] Specifically, the Purchase Agreement defined "Events of Default" to include: "[Fitness] shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of the Notes or any other Loan Document on the due date and such payment shall not have been made within fifteen (15) days of [Fitness's] receipt of Requisite Purchasers' written notice to [Fitness] of such failure to pay." Plf.'s Mot., Ex. 4 at 1; Purchase Agreement § 5.1.

[4] Plf.'s Mot. at 5, Ex. 1 § 5.2; Ex. 2 § 3.3.

[5] Quader Decl. ¶¶10-11. The pleadings do not refer to New TSI or the agreements between Fitness and New TSI. Defendant submitted the Quader Declaration with its opposition to Plaintiffs' Motion for Judgment on the Pleadings. Consistent with the requirements of Rule 12(c), the Court has not considered this additional information for purposes of ruling on the motion. It is included here only for its relevance to Fitness's "fairness" argument. *See* page 14-15, *supra*.

3

debt. Once New TSI repaid the loan, Fitness in turn could repay its secured and unsecured lenders.[6] The court overseeing Town Sports' bankruptcy approved this transaction.[7]

The earlier of the two maturity dates, December 31, 2020, passed without Fitness making the required payments under the Notes. On January 4, 2021, Bay Point sent Fitness a notice of default giving Fitness 15 days to cure the default by making full payment under the Notes. Fitness did not make any payment within the cure period and has not made any payment under the Notes since that time.

On March 8, 2021, Bay Point filed this action for breach of contract and declaratory judgment. Bay Point seeks a judgment in the amount of all outstanding principal, interest, exit fees, and attorneys' fees, particularly (1) $5,337,671.23 for the note issued to Bay Point Capital Partners, L.P., plus interest at the contractual rate of $2,054.79 per day; (2) $1,589,383.56 for the note issued to Bay Point Capital Partners II, L.P., plus interest at the contractual rate of $616.44 per day; and (3) the attorneys' fees Bay Point incurred enforcing the Notes.

At Fitness's request, Bay Point agreed to extend by 30 days the deadline for Fitness to answer the complaint. During this period, Fitness took steps to attempt to extend the Notes' Maturity Date and to change the interest rate payable under the

---

[6] Quader Decl. ¶ 12.
[7] Quader Decl. ¶ 13.

4

Notes. Fitness purported to take this action under Section 7.6 of the Purchase Agreement and Section 9.6 of the Notes. Section 7.6 prohibits any amendment, waiver, or modification of the Purchase Agreement except one made in writing and approved by Fitness and Peak:

> 7.6 <u>Amendment; Modification; Waiver</u>. No amendment, modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective unless in writing and approved by [Fitness] and [Peak].

Section 9.6 similarly requires Fitness and Peak to consent in writing to any amendment or modification of the Notes:

> No amendment, modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective unless in writing an approved by [Fitness] and [Peak].

Fitness and Peak entered into an Amendment to the Purchase Agreement and the Notes (the "Amendment") on April 28, 2021. That Amendment purported to extend the Note Maturity Date to June 30, 2021, and also purported to reduce the interest rate under the Notes to 5% per annum beginning June 1, 2021. Two days after signing the Amendment, Fitness filed its Answer and Affirmative Defense in this action. Fitness admitted the Notes are a valid obligation, and conceded its initial default under the Notes, but claimed it no longer was in default in light of the Amendment.

Bay Point then filed its motion for judgment on the pleadings, and the parties briefed and argued that motion. By the time the motion was briefed, the June 30,

5

2021 maturity date contained in the Amendment had passed, but Fitness still had not satisfied its obligations under the Notes.

## PARTIES' CONTENTIONS

In support of its motion for judgment on the pleadings, Bay Point contends Fitness defaulted under the Notes' and Purchase Agreement's plain terms by failing to pay the outstanding principal, interest, and exit fees by the December 31, 2021 Maturity Date. Bay Point argues Fitness cannot rely on the Amendment because Sections 7.6 and 9.6 do not allow Fitness and Peak to amend the Notes without Bay Point and the other Purchasers' consent. Bay Point interprets Sections 7.6 and 9.6 as "consent right provisions" that give Fitness and Peak a right to consent to any amendment and that require such amendment to be in writing. Those sections do not, Bay Point maintains, waive the common law rule that parties to an agreement must mutually assent to any amendment to a contract. Bay Point further asserts the Amendment was not effective under Delaware law because it was entered into without Bay Point's consent and without Bay Point receiving any consideration for it.

Fitness disagrees, arguing this Court must deny Bay Point's motion for judgment on the pleadings because the contractual language at issue fairly is susceptible of two reasonable interpretations. Fitness contends Bay Point is an unsecured creditor that is using this action to place itself in a superior position to

6

Fitness's other unsecured creditors. Fitness argues Bay Point waived its right to consent to an amendment to the Purchase Agreement or the Notes and that Sections 7.6 and 9.6 permit amendment to the Purchase Agreement and the Notes at Fitness's and Peak's sole discretion. Fitness asserts Bay Point's interpretation of Sections 7.6 and 9.6 would render the language regarding Fitness's consent superfluous because Fitness already had such a right under common law. Finally, Fitness argues the Amendment was supported by consideration because it "normalized" the interest rate Fitness owed Peak and the Purchasers.

## STANDARD OF REVIEW

In deciding a motion for judgment on the pleadings under Superior Court Civil Rule 12(c), the Court accepts the truth of all well-pleaded facts contained in the pleadings and draws all reasonable factual inferences in favor of the non-moving party.[8] The Court accords the party opposing a Rule 12(c) motion the same benefits as a party defending a motion to dismiss under Rule 12(b)(6).[9] Accordingly, this Court will grant a motion for judgment on the pleadings only if, after drawing all reasonable inferences in favor of the non-moving party, there is no material fact in

---

[8] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[9] *Alcoa World Alumina LLC v. Glencore Ltd.*, 2016 WL 521193, at *6 (Del. Super. Ct. Feb. 8, 2016), *aff'd sub nom.*, *Glencore Ltd. v. St. Croix Alumina, LLC*, 2016 WL 6575167 (Del. Nov. 4, 2016); *see Silver Lake Off. Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378, at *6 (Del. Super. Ct. Jan. 17, 2014) ("The standard for a motion for judgment on the pleadings is 'almost identical' to the standard for a motion to dismiss." (internal quotation marks omitted)).

7

dispute and the moving party is entitled to judgment as a matter of law.[10] A Rule 12(c) motion is "a proper framework for enforcing unambiguous contracts," which have only one reasonable meaning and therefore do not create material disputes of fact.[11]

## ANALYSIS

Resolution of Bay Point's motion turns on the proper interpretation of Section 7.6 of the Purchase Agreement and Section 9.6 of the Notes. Delaware adheres to the objective theory of contract interpretation, meaning the Court must attempt to give effect to the parties' shared expectations at the time they entered into those agreements and interpret the contractual language in the manner that "would be understood by an objective, reasonable third party."[12] The Court therefore reads the agreement as a whole, giving purpose to each provision.[13] The Court construes "clear and unambiguous terms according to their ordinary meaning" and does not consider evidence outside a contract's four corners unless the contract is ambiguous.[14] A

---

[10] *V&M Aerospace LLC v. V&M Co.*, 2019 WL 3238920, at *3 (Del. Super. Ct. July 18, 2019).
[11] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (alteration omitted); *see also VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (observing that ambiguity creates a fact dispute and that a court cannot dismiss breach of contract allegations unless the movant's construction of the disputed term "is the *only* reasonable construction as a matter of law").
[12] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).
[13] *E.g., Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).
[14] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).

contract is ambiguous only if it fairly is susceptible of two reasonable interpretations.[15]

This Court also interprets contracts with a view toward the significant body of common law principles governing the formation, interpretation, and modification of contracts.[16] The parties to a contract may, of course, contract around virtually all common law rules. But in the absence of a written provision to the contrary, the common law rules "form an implied part of every contract."[17] Those principles include, pertinently, that (1) an agreement cannot be modified without all the contracting parties' assent and without additional consideration;[18] and (2) parties to a contract generally may amend or modify a contract orally.[19] Fitness conceded at oral argument that these common law principles govern a contract absent written provisions to the contrary.

---

[15] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (observing that a contract term is ambiguous only if it is "fairly or reasonably susceptible to more than one meaning").

[16] *See, generally Concord Real Estate CDO 2006-1, Ltd. v. Bank of America N.A.*, 996 A.2d 324, 332 (Del. Ch. 2010); Williston on Contracts § 30:19 ("Except where a contrary intention is evident, the parties to a contract . . . are presumed or deemed to have contracted with reference to existing principles of law.").

[17] *Concord Real Estate CDO 2006-1, Ltd. v. Bank of America N.A.*, 996 A.2d 324, 332 (Del. Ch. 2010).

[18] *Affordable Autos, Inc. v. Dietert*, 2016 WL 1169244, at *4 (Del. Super. Mar. 24, 2016); *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. 2000).

[19] *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) ("the parties [to a contract] have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit."); *Hursey Porter & Assocs. V. Bounds*, 1994 WL 762670, at *6 (Del. Super. Dec. 2, 1994) (same).

Fitness argues, however, that Sections 7.6 and 9.6 altered those common law rules by (1) limiting the parties whose consent is required for an amendment, and (2) requiring any amendment to be memorialized in writing. Bay Point, on the other hand, argues Sections 7.6 and 9.6 are consent provisions that (1) require Peak's consent to any amendment to the Purchase Agreement or Notes, even though Peak is not a party to the Notes; and (2) require Peak's and Fitness's consent to be written, rather than oral. Fitness acknowledges that Bay Point's interpretation is a reasonable one but contends Sections 7.6 and 9.6 are ambiguous because Fitness's proffered interpretation also is reasonable.

Fitness's interpretation is not reasonable. Sections 7.6 and 9.6's plain terms, phrased in the negative, preclude any amendment unless Fitness and Peak consent to it and it is memorialized in writing. Those sections alter the common law by (1) giving Peak the right to consent to all amendments, even though Peak is not a party to the Notes, and (2) limiting the parties' ability to amend the agreements orally. Sections 7.6 and 9.6 do not expressly or impliedly waive the Purchasers' common law right to consent to any amendment to their contracts. Such a reading would be an extraordinary limitation on the unsecured creditors' rights, giving Fitness and Peak the unfettered right to modify the parties' agreement to the unsecured creditors' detriment. Had the parties intended such an extreme result, they would have expressly stated that the unsecured creditors affirmatively were waiving their

10

rights.[20] Instead, the language on which Fitness relies is stated in the negative: it restricts modification or amendment without the written consent of certain entities, but does not affirmatively grant those entities the unilateral right to amend the agreements.

Fitness makes much of the fact that the Purchase Agreement and Notes do not contain any other sections addressing amendments or modifications. The absence of any additional amendment provisions does not, in and of itself, mean that Fitness may amend the Purchase Agreement or the Notes as long as it does not run afoul of Sections 7.6 and 9.6. Rather, as explained above, those contractual provisions modify some of the common law principles associated with amending contracts. Absent additional language waiving the Purchasers' common law right to assent to amendments and receive consideration for any amendment, those common law principles continue to control.

Moreover, the interpretation Fitness offers would lead to an absurd result, contradicting the rule that this Court should interpret contracts in a way that avoids absurdities.[21] Taken to its logical conclusion, Fitness's interpretation would allow

---

[20] *See, e.g., Kortum v. Webasto Sunroofs, Inc.,* 769 A.2d 113 (Del. Ch. Feb. 9, 2000) ("There can be no waiver of a statutory right unless that waiver is clearly and affirmatively expressed in the relevant document.") (citing *Hintmann v. Fred Weber, Inc.,* 1998 WL 83052, Steele, V.C. Mem. Op. at 28 (Feb. 17, 1999)).

[21] *See, e.g., Manti Hldgs, LLC v. Authentix Acquisition Co., Inc.,* -- A.3d ---, 2021 WL 4165159, at *7 (Del. Sept. 13, 2021) ("Delaware courts read contracts as a whole, and interpretations that are commercially unreasonable or produce absurd results must be rejected."); *Osborn v. Kemp,*

11

Peak and Fitness to rewrite all the essential terms in the parties' agreement, including reducing the interest rate to zero, extending the maturity date into perpetuity, or reducing the principal amount owed under the Notes. Fitness acknowledges its interpretation would permit Fitness and Peak to take actions that could prejudice the unsecured creditors materially. Fitness argues, however, that the implied covenant of good faith and fair dealing, which inheres in every contract, would prevent Fitness and Peak from amending the agreements in a way that is unfair to the unsecured creditors.

Fitness's reliance on the implied covenant to rescue its unreasonable contractual interpretation falters for at least two reasons. First, an implied covenant claim cannot lie where the contract governs the matter at issue.[22] If, as Fitness contends, Sections 7.6 and 9.6 allow Fitness and Peak to amend the Purchase Agreement or the Notes in their sole discretion, then there likely is no room for the Court to imply terms that would vary that right.[23] The implied covenant exists to fill unanticipated gaps in a contract, and Fitness's contention that Sections 7.6 and 9.6 accord Fitness and Peak the exclusive right to amend the agreements arguably

_____

991 A.2d 1153, 1160 (Del. 2010) ("[a]n unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

[22] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014).

[23] *Allen*, 113 A.3d at 183 ("[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue.") *See also Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020 ,1032 (Del. Ch. 2006) ("implied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand.").

precludes any argument that the parties failed to anticipate the need to negotiate contractual terms regarding amendments to the agreements.

Second, even if an implied covenant claim could survive, Fitness acknowledged at oral argument that such claims rarely are successful and inherently are fact dependent.[24] Even when a court finds a gap in a contract, the court "should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it."[25] Indeed, Fitness could not identify the circumstances under which the Purchasers could advance a successful implied covenant claim, arguing instead that such a claim would depend on all the circumstances in the case and when a reviewing court determined those circumstances became inherently unfair. It is unreasonable to conclude that the unsecured creditors would have been content to rely on this amorphous promise of fairness in exchange for granting Peak and Fitness the power to erase the Purchasers' rights under the Notes.

In addition, Fitness concedes Sections 7.6 and 9.6 did not eliminate Bay Point's right to receive consideration for a modification to its contractual rights. Rather, Fitness contends Bay Point received such consideration in the form of a

---

[24] *KT4 Partners, LLC v. Palantir Techs. Inc.*, 2021 WL 28223567, at * 27 (Del. Ch. Jun. 24, 2021).
[25] *Oxbow Carbon & Min. Hldgs, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (citing *Nationwide Emerging Managers, LLC v. Northpointe Hldgs.*, LLC, 112 A.3d 878, 897 (Del. 2015)).

"normalization" of the difference between the interest rate owed to Peak and the rate owed to the other Purchasers.[26] This argument, however, ignores the fundamental nature of consideration as a bargained-for benefit to the promisee or detriment to the promisor.[27] One party to a contract cannot unilaterally determine what constitutes sufficient consideration to induce the counterparty's performance. Accordingly, in addition to the lack of mutual asset, the Amendment also fails for lack of consideration.

Finally, although it is not dispositive of the pending motion, the Court feels compelled to comment upon the "fairness argument" Fitness emphasized in its briefs and at oral argument. In Fitness's view, the Amendment was necessary to "protect the unsecured creditors from having [Bay Point] 'jump the line' in the event Fitness files for bankruptcy protection . . . ."[28] Although the parties' motivations are irrelevant to the breach of contract claim, the Court would be remiss not to point out the holes in this portrayal of Fitness and Peak as the unsecured creditors' champion. Missing from this picture is the fact that, by purporting to extend the maturity date

---

[26] Def.'s Answering Br. at 8. Fitness does not explain what it means by "normalization," and the record does not reflect what interest rate Peak was entitled to receive before the Amendment.

[27] *See, e.g., Consideration*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "consideration" as "[s]omething (such as an act, a forbearance or a return promise) that is bargained for and received by a promisor from a promise; that which motivates a person to do something, esp. to engage in a legal act."); RESTATEMENT (SECOND) CONTRACTS § 71(1) ("To constitute consideration, a performance or a return promise must be bargained for."); 17 A AM. JUR. 2D *Contracts* § 114 at 135-36 (2008 Supp.) (same and adding "[i]t is not 'consideration' if it is not accepted, or if it is not regarded as 'consideration' by both parties.").

[28] Def.'s Answering Br. at 6.

and reduce the interest rate, Peak is allowing its affiliate, New TSI, additional time before Fitness or its creditors begins pressing for repayment of the loan to New TSI, while potentially also reducing the amount New TSI may owe to Fitness.[29] In addition, the Amendments, if effective, would stave off a bankruptcy filing by Fitness and increase the likelihood that Peak will receive full payment on its secured debt. In other words, the Amendment serves Peak's and Fitness's respective interests. Again, however, this argument has no real relevance to the pending motion except to the extent Fitness raised it as yet another reason the Court should conclude that Fitness's interpretation of Sections 7.6 and 9.6 is reasonable.

## CONCLUSION

For the foregoing reasons, Bay Point's Motion for Judgment on the Pleadings is **GRANTED** as to its breach of contract and declaratory judgment claims. The parties shall confer and submit a conforming form of order and judgment within ten days. **IT IS SO ORDERED.**

---

[29] It is unclear from the record if New TSI's repayment obligation is tied to the interest rates contained in the Notes. *See, e.g.* Quader Decl. ¶ 14 ("Plaintiffs most favorable scenario . . . would be for New TSI to refinance Plaintiffs' debt or otherwise earn a profit on the business *in order to pay Plaintiffs what was owed on the Notes*.")