# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PENEFF HOLDINGS LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-0435-BWD |
| NURTURE LIFE, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

## POST-TRIAL FINAL REPORT

Final Report:  August 28, 2024
Date Submitted:  August 22, 2024

John L. Williams, Brian C. Crawford, and Aaron R. Harburg, of THE WILLIAMS LAW FIRM, P.A., Wilmington, Delaware, *Attorneys for Plaintiff Peneff Holdings LLC*.

Francis G. X. Pileggi and Andrew A. Ralli, of LEWIS BRISBOIS BISGAARD & SMITH LLP, Wilmington, Delaware; OF COUNSEL: Chauna A. Abner, of MCGUIRE WOODS LLP, Baltimore, Maryland, *Attorneys for Defendant Nurture Life, Inc*.

**DAVID, M.**

Plaintiff Peneff Holdings LLC ("Plaintiff" or "Peneff") seeks an order to compel the inspection of defendant Nurture Life, Inc.'s ("Nurture Life" or the "Company") books and records pursuant to Section 220 of the Delaware General Corporation Law. Nurture Life's threshold defense is that an amended investors' rights agreement waives Plaintiff's statutory inspection rights. This final report rejects that argument and concludes that Plaintiff is entitled to inspect some, but not all, of the books and records it seeks.

## I. BACKGROUND

The following facts are drawn from the factual stipulations in the parties' pretrial order, the deposition testimony of two witnesses submitted in lieu of live testimony at trial, and fifty joint trial exhibits.[1]

### A. Plaintiff Invests $4 Million In Nurture Life.

Nurture Life is a privately held Delaware corporation that delivers prepared meal kits and fresh meals to households for consumption by young children, toddlers and infants.[2] Nurture Life's board of directors (the "Board") comprises five directors, including the company's founders, Steven Minisini and Jennifer Chow,

---

[1] Joint exhibits are referred to according to the numbers provided on the parties' joint exhibit list and are cited herein as "JX __", unless otherwise defined. The August 22, 2024 trial transcript has not been finalized. Citations in the form of "Draft Tr. __" refer to a draft transcript of the August 22, 2024 trial.

[2] Joint Pretrial Stip. and Order [hereinafter "PTO"] ¶ 2, Dkt. 38.

who are married.[3]  Plaintiff, an Illinois limited liability company, is a Nurture Life stockholder.[4]  Plaintiff's principals, Christian Peneff and Pavel Peneff, also own non-party Merx Global, Inc. ("Merx Global"), a transportation company incorporated in Illinois.[5]

On March 7, 2019, Nurture Life and certain investors executed an Investors' Rights Agreement (the "IRA").[6]  The IRA provides each "Major Investor"—defined to include "any Investor that, individually or together with such Investor's Affiliates . . . holds at least 353,008 shares of Registrable Securities"—with contractual information rights.[7]  Namely, Section 3.1 of the IRA requires the Company to deliver to each Major Investor certain categories of information within specified time periods.[8]  In addition, Section 3.2 of the IRA states:

> Inspection.  The Company shall permit each Major Investor (provided that the Board of Directors has not reasonably determined that such Major Investor is a Competitor of the Company), at such Major Investor's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Major Investor; provided, however, that the Company shall not be obligated

---

[3] *Id.* ¶¶ 3-4.

[4] *Id.* ¶¶ 10-12.

[5] *Id.* ¶ 5.

[6] *Id.* ¶ 6.

[7] *Id.* ¶¶ 7-8.

[8] JX 1 [hereinafter "IRA"].

pursuant to this Subsection 3.2 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.[9]

On March 24, 2021, Plaintiff purchased a warrant for 893,968 shares of Series A-2 Preferred Stock.[10] As of September 2021, Plaintiff held 1,357,259 shares of Series A-2 Preferred Stock in addition to warrants and convertible notes.[11] By October 2021, Plaintiff had invested approximately $4 million in Nurture Life and owned a total of 2,808,958 shares of Series A-2 Preferred Stock and 2,955,046 shares of Series A-3 Preferred Stock.[12]

Although Plaintiff never executed and delivered a signature page to the IRA, it does not contest that it is bound by the IRA.[13] From March 2021 through mid-July 2023, Nurture Life provided Plaintiff with the same quarterly financial reports that it provided to other "Major Investors" under the IRA.[14]

---

[9] *Id.* § 3.2.

[10] PTO ¶ 10.

[11] *Id.* ¶ 11.

[12] *Id.* ¶ 12.

[13] Draft Tr. at 52.

[14] PTO ¶ 35.

### B. Merx Global Initiates Arbitration And Litigation Against Nurture Life.

On December 1, 2021, Nurture Life and Merx Global executed a Transportation Services Agreement ("TSA") in which Merx Global agreed to provide refrigerated transportation services to Nurture Life.[15] In connection with the TSA, Nurture Life and Merx Global also executed a convertible promissory note (the "Merx Convertible Note").[16]

In October 2023, Nurture Life and Merx Global attempted to renegotiate the terms of their relationship but did not reach an agreement.[17] On November 2, 2023, Merx Global delivered a notice to Nurture Life demanding payment under the Merx

---

[15] *Id.* ¶ 15; JX 20 ¶ 3, Ex. A.

[16] JX 20 ¶ 3, Ex. A.

[17] During those discussions, Minisini emailed Christian Peneff a capitalization table (the "First Cap Table"), which showed that Merx Global owned 477,788 shares of Series A-3 Preferred Stock. PTO ¶ 36; JX 11. Later that month, Minisini provided a different capitalization table (the "Second Cap Table"), which showed Merx Global owning 477,788 shares of Series A-3 Preferred Stock plus 1,442,547 shares of Series A-1 Preferred Stock. Pl. Peneff Hldgs. LLC's Pre-Trial Br. [hereinafter "POB"] at 5-6, Dkt. 27. Nurture Life later took the position that fees owed to Merx Global had been converted into 1,442,547 shares of Series A-1 Preferred Stock in May 2023. *Id.*

Convertible Note.[18]  On November 17, 2023, Merx Global sent a litigation hold letter to Nurture Life.[19]

On November 30, 2023, Merx Global initiated an arbitration against Nurture Life with the American Arbitration Association (the "Merx Arbitration"), alleging that Nurture Life breached the TSA by failing to make payments from May through November 2023.[20]  On August 2, 2024, following a two-day hearing, the arbitrator issued an interim award for Merx Global and against Nurture Life for $1,022,410, finding Nurture Life breached the TSA by failing to pay outstanding transportation fees from May through December 2023.[21]  The arbitrator found that from December 2021 to May 2023, $2 million due to Merx Global under the TSA was converted into equity pursuant to the Merx Convertible Note, and thereafter, an additional $1,022,410 due under the TSA was payable in cash.[22]

On December 14, 2023, Merx Global filed a lawsuit against Nurture Life in the Circuit Court of Cook County, Illinois (the "Merx Lawsuit"), alleging that

---

[18] PTO ¶ 17; JX 15.

[19] PTO ¶ 18; JX 16.  On November 22, 2023, Nurture Life amended its Third Amended and Restated Certificate of Incorporation to increase the number of authorized shares of Series A-1 Preferred Stock.  PTO ¶ 26.  Plaintiff contends that the Second Cap Table could not have been accurate because the shares of Series A-1 Preferred Stock that Merx Global purportedly owned were not yet authorized.  POB at 6.

[20] PTO ¶ 19; JX 20.

[21] JX 45.

[22] *Id.*

Nurture Life had breached the Merx Convertible Note by failing to convert outstanding transportation fees to shares of Series A-3 Preferred Stock.[23] The Merx Lawsuit remains pending.[24]

### C.    Nurture Life Purports To Amend The IRA.

On October 26, 2023, Nurture Life and non-party Align Ventures I, LP ("Align Ventures") executed a term sheet under which Align Ventures would invest $5 million in Nurture Life in exchange for shares of Series B Preferred Stock (the "2023 Series B Financing"), with capital proceeds to be used for "general corporate purposes, growth initiatives, research and development, innovation, marketing, and hiring and retaining Company personnel."[25]

Effective December 28, 2023, the Board executed a written consent purporting to approve an issuance of shares of Series B Preferred Stock to facilitate the 2023 Series B Financing and to amend the IRA (the "Amended IRA").[26] Section 1.20 of the Amended IRA states that "an Investor shall cease to be a 'Major Investor' in the event such Investor and/or its Affiliates consummate any formal legal action, suit, proceeding, or arbitration, against the Company."[27] After the amendment,

---

[23] PTO ¶ 20; JX 21.

[24] Draft Tr. at 13.

[25] PTO ¶¶ 23-24.

[26] JX 22.

[27] PTO ¶ 28; JX 24.

Nurture Life took the position that Plaintiff was not a "Major Investor" with information rights under the Amended IRA and ceased providing Plaintiff with quarterly financial reports.[28]

On January 10, 2024, Nurture Life filed a Form D (Notice of Exempt Offering of Securities) with the U.S. Securities and Exchange Commission, disclosing that Nurture Life had used proceeds from the 2023 Series B Financing to pay Jennifer Chow $200,000, with authorization to pay an additional amount of up to $1 million, due under a promissory note.[29]

### D. The Demand

On February 12, 2024, Plaintiff served a demand on Nurture Life pursuant to 8 *Del. C.* § 220 (the "Demand"), seeking to inspect seventeen categories of books and records for the following purposes:

1) to determine the value of the Company;

2) to determine whether management properly accounted for expenses of the Company in its financial records and tax returns;

3) to determine whether the Company favored the interests of Directors, executive officers and key employees over stockholders, equity owners and unsecured creditors in negotiating with potential investors and/or purchasers;

---

[28] Draft Tr. at 72-79.

[29] PTO ¶ 25; JX 26 at PeneffHldgs000985.

4)     to determine whether the Company favored the interests of Directors, executive officers and key employees over stockholders, equity owners and unsecured creditors in paying its obligations; . . .

5)     to determine if the Company represented its financials to prospective investors in a manner so as to obfuscate the existence of the Transportation Services Agreement, between the Company and Merx Global, Inc., dated December 1, 2021; and

6)     to determine if the Company represented its capitalization to stockholders, equity owners, unsecured creditors and prospective investors and purchasers in a misleading manner.[30]

On February 23, 2024, Nurture Life rejected the Demand on the grounds that the Amended IRA "precluded" inspection; Plaintiff lacked a proper purpose for making the Demand; and the Demand was overbroad in scope.[31]

On April 24, 2024, Plaintiff filed its Verified Complaint for Inspection of Books and Records (the "Complaint").[32]  The Court held a trial on a paper record on August 22, 2024.[33]

## II.     ANALYSIS

"To inspect books and records under Section 220, a plaintiff must establish by a preponderance of the evidence that the plaintiff is a stockholder, has complied

---

[30] JX 30 (Demand).

[31] JX 32.

[32] Pl.'s Verified Compl. for Inspection of Books and Records, Dkt. 1.

[33] Dkt. 42.

with the statutory form and manner requirements for making a demand, and has a proper purpose for conducting the inspection." *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020), *judgment entered*, (Del. Ch. 2020). "If a stockholder meets these requirements, the stockholder must then establish 'that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose.'" *Id.* (citing *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)).

As a threshold matter, Nurture Life contends that Plaintiff has waived its inspection rights under Section 220 through the Amended IRA. Nurture Life also contends that Plaintiff has not demonstrated a proper purpose; Plaintiff's stated purposes are pretexts to obscure its actual, improper purpose for making the Demand; and the scope of the Demand is overbroad. Those arguments are addressed in turn, below.

### A. The Amended IRA Does Not Waive Plaintiff's Statutory Inspection Rights.

Nurture Life contends that the Amended IRA forecloses Plaintiff's inspection rights under Section 220. It does not.

Section 3.2 of the IRA provides that "[t]he Company shall permit each Major Investor . . . to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably

9

requested by the Major Investor . . . ."[34]  The parties agree that Plaintiff does not meet the definition of "Major Investor" under the Amended IRA.[35]  So, assuming the Amended IRA is valid, Plaintiff lacks contractual inspection rights under Section 3.2.  But the plain language of Section 3.2 does not address extra-contractual sources of inspection rights.  The agreement says a Major Investor is contractually entitled to information; it does not say the inverse—that a stockholder who no longer qualifies as a Major Investor forfeits other information rights.[36]

Nurture Life does not contend that the Amended IRA clearly and unambiguously waives statutory inspection rights.  Nevertheless, it argues that the intent of Section 3.2 is to supplant all other sources of information rights.[37]

A contract provision clearly and unambiguously purporting to waive the statutory inspection rights of a signatory stockholder falling outside the definition of

---

[34] IRA § 3.2.

[35] Draft Tr. at 52, 78.

[36] IRA § 3.2; Draft Tr. at 79.

[37] *See* Draft Tr. at 79 ("Q.  I see in the agreement where it says that Major Investors are entitled to certain information rights under the contract.  Where does it say that if a stockholder is not a Major Investor, then that stockholder does not have information rights under the statute?  A.  The intent of the provision . . . is that it extends to the statute.  There is no specific agreement saying that this is a contractual limitation or statutory.  It's silent on that point and . . . it covers both the contractual and statutory . . . .  It's just any of the inspection rights, whether that be contractual or statutory."); *see also* Def.'s Answering Br. [hereinafter "DAB"] at 10, Dkt. 33 (claiming "only 'Major Investors' may access Nurture Life's books and records").

10

"Major Investor" could present an interesting question under Delaware law. On one hand, "Delaware decisions have rejected efforts by corporations to limit or eliminate inspection rights." *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 919 (Del. Ch. 2020).[38] On the other hand, Delaware recognizes "parties' ability to waive other important rights, whether constitutional or statutory[,]"[39] suggesting there could be arguments for enforcing waivers of statutory inspection rights in private contracts. But even assuming a stockholder can waive statutory inspection rights by contract, the waiver must be clear. *See Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 125 (Del. Ch. 2000) ("There can be no waiver of a statutory right unless that waiver is clearly and affirmatively expressed in the relevant document."); *see also Juul Labs, Inc.*, 238 A.3d at 920 n.15 ("Perhaps even a clear and express waiver would be contrary to

---

[38] *See also State v. Penn-Beaver Oil Co.*, 143 A. 257, 260 (Del. 1926) ("[T]he provision in defendant's charter which permits the directors to deny any examination of the company's records by a stockholder is unauthorized and ineffective."); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *5 (Del. Ch. Apr. 28, 2004) ("Nor could they rely upon a certificate provision prohibiting disclosure to avoid a shareholder's inspection right conferred by statute."); *Loew's Theaters, Inc. v. Com. Credit Co.*, 243 A.2d 78, 81 (Del. Ch. 1968) (holding that a charter provision limiting inspection rights to holders of 25% of shares was void); *State ex rel. Healy v. Superior Oil Corp.*, 13 A.2d 453, 454 (Del. Super. Ct. 1940) ("In Delaware it has been considered that the right of a stockholder to examine the books of the company is a common law right and can only be taken away by statutory enactment."); *State v. Loft, Inc.*, 156 A. 170, 173 (Del. Ch. 1931) (following *Penn-Beaver*).

[39] *See Juul Labs, Inc*, 238 A.3d at 919 ("[T]here are arguments for distinguishing between provisions that appear in [a corporation's governing] documents and waivers in private agreements."); *see also New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 530 (Del. Ch. 2023) ("Delaware law permits individuals to waive significant liberty and property interests that are arguably weightier than a right appurtenant to a share.").

11

public policy under *Penn-Beaver* and its progeny, but the standard set forth in *Kortum*, at minimum, implies that a stockholders' agreement could waive statutory inspection rights *if the waiver was sufficiently clear*.") (emphasis added). Because Section 3.2 of the Amended IRA does not clearly waive statutory inspection rights, it cannot foreclose the relief sought in the Demand.[40]

## B. Plaintiff Has Demonstrated Proper Purposes for Inspection.

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection." *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982). "In a section 220 action, a stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence." *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

---

[40] Whether Plaintiff could be bound by a clear waiver in a contract amendment to which it did not specifically agree presents another interesting question I need not resolve. *See* Draft Tr. at 75 ("[I]n full candor Nurture Life recognizes that there is no case law in Delaware finding that adoption may unilaterally eliminate or waive the inspection right of a stockholder but there is also no case law stating that it cannot be done."). Some Delaware cases draw a distinction between unilaterally adopted bylaws, which cannot waive statutory inspection rights, and contracts to which the parties actually consent, where the effect of an express waiver of statutory inspection rights is less clear. *See Juul Labs, Inc.*, 238 A.3d at 920 n.16 (noting arguments distinguishing between the implied consent regime underlying unilaterally adopted bylaws and the actual consent regime for contracts); *cf. New Enter. Assocs. 14, L.P.*, 295 A.3d at 585 n.275 ("The differences between how a stockholder-level agreement and a charter provision can affect Section 220 rights is another manifestation of the more general distinction Delaware law draws between restrictions on stockholder-level rights in stockholder-level agreements and restrictions in the charter or bylaws."). The Amended IRA here seems to fall somewhere in the middle.

12

### 1.      Plaintiff Has Stated Proper Purposes.

As articulated in the Demand, Plaintiff seeks books and records for six purposes.  The first purpose stated in the Demand is to value Plaintiff's shares. Under Delaware law, a stockholder's desire to value its interests in the company— particularly where the company is privately held—"has long been recognized as a proper purpose" to inspect books and records.  *Woods v. Sahara Enters., Inc.*, 238 A.3d 879, 890 (Del. Ch.) (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 713 (Del. Ch. 1995), *aff'd*, 681 A.2d 1026 (Del. 1996) (hereinafter "*Thomas & Betts Corp.* (Del. Ch.)")) (citing cases).  Nurture Life does not contest that valuation is a proper purpose for inspecting books and records under Delaware law.

Plaintiff's remaining purposes for the Demand seek to investigate possible corporate wrongdoing.[41]  Under Delaware law, a stockholder's desire to investigate wrongdoing is a proper purpose.  However, "[a] mere statement of a purpose to investigate possible general mismanagement, without more, will not entitle a shareholder to broad § 220 inspection relief."  *Seinfeld*, 909 A.2d at 122 (quoting *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166 (Del. Ch. 1987)).  To establish a proper purpose of investigating wrongdoing, a

---

[41] *See* POB at 10 ("[T]he other five of the purposes are designed to investigate various forms of mismanagement and wrongdoing by Nurture Life.").

13

stockholder "must present some evidence to suggest a credible basis from which a court can infer that . . . wrongdoing may have occurred." *Pettry*, 2020 WL 6870461, at \*10 (quoting *Seinfeld*, 909 A.2d at 122). The credible basis standard imposes "the lowest possible burden of proof." *Seinfeld*, 909 A.2d at 123. It does not require a stockholder to prove that the wrongdoing "actually occurred." *Marmon*, 2004 WL 936512, at \*4. It does not require a stockholder "to show by a preponderance of the evidence that wrongdoing is probable." *Lebanon Cty. Empls.' Ret. Fund v. Amerisourcebergen Corp.*, 2020 WL 132752, at \*8 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020). It requires only that a stockholder "establish by a preponderance of the evidence that there is a credible basis to suspect a *possibility* of wrongdoing." *Pettry*, 2020 WL 6870461, at \*11. That burden may be "satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing." *Id.* (quoting *Seinfeld*, 909 A.2d at 123).

At trial, Plaintiff combined its five investigation purposes into two: (1) investigating whether Nurture Life fiduciaries engaged in misconduct by using proceeds from the 2023 Series B Financing to make "insider payments" to Jennifer Chow, and (2) investigating whether Nurture Life misreported its shipping and transportation costs to investors by failing to include amounts owed to Merx Global in its financial statements.

14

Plaintiff has established a credible basis to investigate whether Nurture Life's fiduciaries engaged in misconduct by using proceeds from the 2023 Series B Financing to pay Chow $200,000, and up to another $1 million, purportedly due under a convertible note. The trial record shows that Nurture Life fiduciaries[42] authorized as much as one-fifth of the financing proceeds to pay Chow on undisclosed terms while the Company conceivably also owed millions of dollars to its vendors.[43] That is sufficient to clear Plaintiff's low burden to show that Nurture Life fiduciaries may have favored the interests of an insider at the expense of the Company. Additionally, it is unclear whether Nurture Life did, in fact, pay Chow the entire $1.2 million identified in the Form D. Whether characterized as the investigation of possible wrongdoing or as an independent proper purpose, stockholders "are entitled to know how their fiduciaries are taking money out of the corporation." *Woods*, 238 A.3d at 901. Accordingly, Plaintiff is entitled to investigate the basic facts under which Nurture Life approved the payments to Chow, including how much Nurture Life actually paid her.

Plaintiff has not, however, met its low burden to show a credible basis to investigate whether Nurture Life misreported shipping and transportation costs to

---

[42] The Form D does not state whether the Board or management approved the payment to Chow. *See* JX 26 at PeneffHldgs000985; *see also* Draft Tr. at 71-72.

[43] JX 26 at PeneffHldgs000985.

investors. At trial, Plaintiff focused this argument on an October 2023 capitalization table that did not reflect shares due under the Merx Convertible Note.[44] Plaintiff asks: if Nurture Life failed to acknowledge Merx Global's equity on its capitalization table, did it also fail to account for sums owed to Merx Global as accounts payable or shipping costs in its financial statements?[45] But Plaintiff must do more than ask the question; it must demonstrate a credible basis to suspect that Nurture Life's financial statements are inaccurate.

In an attempt to meet its burden, Plaintiff contends that the Merx Lawsuit and one other vendor lawsuit in which Nurture Life denied liability for certain expenses[46] show Nurture Life's fiduciaries are "mismanaging key business relationships" and have "not been honest with investors and prospective investors about the financial health of the Company."[47] But these negative characterizations of pending legal matters, without more, fail to cast doubt on the accuracy of Nurture Life's financial

---

[44] Draft Tr. at 32; *see also* POB at 16-17; Pl.'s Reply Br. [hereinafter "PRB"] at 5, 9, Dkt. 35.

[45] Draft Tr. at 38 ("If you say it's not owed, [and] . . . it's not being reported as convertible notes that we know of, are you even reporting it on expenses?").

[46] JX 45 at 2; JX 8 ¶ 2.

[47] POB at 15.

statements.[48] Plaintiff also claims that, "[a]t one point[,] Mr. Minisini told [Christian] Peneff that he would not be disclosing the existence of the [TSA] . . . to investors[,]"[49] but a decision not to disclose a specific contract to stockholders does not give rise to an inference that the company's financial statements underreport expenses associated with that contract.[50]

In short, Plaintiff has established proper purposes to value its shares and to investigate an insider payment. It has not established a credible basis to investigate whether Nurture Life fiduciaries misreported costs in financial statements.

### 2. Plaintiff's Stated Purposes Are Its Actual, Primary Purposes.

Nurture Life contends that even if Plaintiff's stated purposes are facially proper, they are not Plaintiff's actual purposes for seeking books and records. "[O]nce a stockholder has identified a proper purpose . . . the burden shifts to the

---

[48] *Cf. Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *6 (Del. Ch. Feb. 25, 2021) (finding public filings, litigation filings, and expert testimony provided a credible basis to investigate alleged misrepresentations in financial statements); *Barnes v. Sprouts Farmers Mkt., Inc.*, 2018 WL 3471351, at *2-3, 6 (Del. Ch. July 18, 2018) (finding secondary offering documents, press releases, statements by directors and officers, and a securities class action that survived a motion to dismiss provided a credible basis to investigate an alleged failure to disclose significant deflation at the time of a stock offering).

[49] POB at 15 (citing JX 32 at 18).

[50] Plaintiff also points out that capitalization tables from October 2023 contain "discrepancies," and that Nurture Life claims to have converted Merx Global's fees into shares of A-1 Preferred Stock without "enough shares authorized at the time of the purported conversion." POB at 17-18. Plaintiff fails, however, to explain how either argument supports its purpose of investigating whether Nurture Life misstated shipping and transportation costs.

17

corporation to prove that the stockholder's avowed purpose is not her actual purpose and that her actual purpose for conducting the inspection is improper." *Woods*, 238 A.3d at 891. "[O]ur courts have given credence to such defenses only where it is evident from the facts on the record that the plaintiff's actual, predominating, purpose is something unrelated to the plaintiff's purpose as a stockholder." *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *9 (Del. Ch. May 16, 2006). "Such a showing is fact intensive and difficult to establish." *Inter-Loc. Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *9 (Del. Ch. Jan. 25, 2019) (quoting *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007)), *aff'd*, 237 A.3d 818 (Del. 2020).

Nurture Life argues that Plaintiff's true purpose for making the Demand is to "retaliate" against the Company for amending the IRA and refusing to "capitulat[e] to the terms of the TSA" that Merx Global sought to renegotiate in October 2023.[51] At trial, however, Nurture Life failed to prove that Plaintiff made the Demand for "retaliatory" purposes rather than purposes related to its interests as a stockholder. For obvious reasons, Nurture Life's characterization of an information demand as "retaliation" for a contractual amendment that purportedly stripped Plaintiff's

---

[51] DAB at 23.

18

information rights rings hollow.[52]  And aside from the existence of the Merx Arbitration and Merx Lawsuit, Nurture Life has not identified any evidence suggesting Plaintiff seeks to retaliate against, harass, or otherwise harm the Company in which it owns a significant equity interest.

Instead, Nurture Life points to what it calls "concessions and inconsistent statements" purportedly showing that Plaintiff sent the Demand in "bad faith."[53]  For example, Nurture Life argues that (1) prior to the Amended IRA, Plaintiff was satisfied with receiving quarterly financial updates, but the Demand now seeks more information than those updates provided;[54] (2) Plaintiff's interrogatory responses categorized its document requests by purpose, but Christian Peneff later testified that every document request in the Demand is necessary for all of Plaintiff's stated

---

[52] Draft Tr. at 50 ("[When] a stockholder is receiving periodic information, that information stops . . . and . . . the stockholders' response is to seek information . . . that doesn't strike me as retaliatory, that strikes me as kind of an obvious response to . . . ceasing [the] flow of information to the stockholder.").

[53] DAB at 21.

[54] This Court has rejected similar arguments.  *See, e.g.*, *Kortum*, 769 A.2d at 124 n.27 ("[The company] also argues that [the stockholder] has already performed a preliminary valuation of its investment, which shows that [the stockholder]'s stated valuation purpose is pretextual. The argument is unpersuasive, because the preliminary valuation, based on less than complete information, buttresses the credibility of [the stockholder]'s claimed need to do a more reliable valuation."); *Thomas & Betts Corp.* (Del. Ch.), 685 A.2d at 713-14 (explaining that a stockholder's ability to perform a preliminary valuation based on incomplete information does not warrant denial of inspection of books and records to value shares).

19

purposes;[55] and (3) Christian Peneff testified that "at least some of the books and records [Plaintiff] seek[s] from Nurture Life are relevant to at least one of the [Merx Global] actions."[56] None of those arguments convince me that Plaintiff's true purposes for making the Demand are not its stated purposes.

Moreover, to the extent Nurture Life suggests Plaintiff's true purpose for seeking books and records is to aid the Merx Arbitration and Merx Lawsuit, it has not shown how the Demand would accomplish that goal. Nurture Life has not identified any limitation on discovery in the arbitration that the Demand seeks to circumvent, nor has it explained how the books and records sought in the Demand could aid the arbitration now that the arbitrator has issued an interim order on liability. Similarly, Nurture Life concedes that the documents sought in the Demand were available to Plaintiff in discovery in the Merx Lawsuit.[57]

For these reasons, Nurture Life has not met its burden to prove that Plaintiff's true purposes for seeking books and records are improper.

---

[55] JX 40 (Peneff Dep.) at 29.

[56] Draft Tr. at 63. This argument mischaracterizes Christian Peneff's testimony, which stated that "only the capitalization tables" sought in the Demand would be relevant to the Merx Arbitration and Merx Lawsuit. *See* JX 40 (Peneff Dep.) at 48-49; JX 42 (Pl.'s Resp. to Def.'s Req. for Admis.) at 5-6, no. 1.

[57] *See* DAB at 29 ("Discovery related to the TSA and capitalization tables was available to Peneff Holdings in that litigation . . . .").

## C.  Scope of Production

Because Plaintiff has established a right to inspection, I turn to the scope of the Demand.  "The scope of inspection is a fact-specific inquiry, and the court has broad discretion when conducting it."  *Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *8 (Del. Ch. Aug. 31, 2022).  The stockholder plaintiff "bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection."  *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 751 (Del. 2019) (citing *Thomas & Betts Corp.*, 681 A.2d at 1035).  "[T]he court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'"  *Id.* at 752.

### 1.  Financial Information

Requests 5 through 8 of the Demand seek financial information about the Company.  Since serving the Demand, Plaintiff has narrowed these requests to seek tax returns; monthly, quarterly, and annual financial statements and trial balances; valuations and appraisals; and forecasts, budgets, and projections.  Except for requests seeking detailed breakdowns,[58] documents responsive to these requests are

---

[58] Plaintiff has not met its burden to demonstrate that "itemized financial records showing breakdowns of the . . . entries" identified in the pre-trial order—including wages and benefits, shipping costs, and notes itemized by creditors—are necessary and essential to Plaintiff's valuation purpose.  PTO ¶ 68.  Plaintiff also seeks "[r]ecords identifying an itemized breakdown of monthly, quarterly and annual shipping and transportation costs by

necessary and essential to Plaintiff's valuation purpose. *See, e.g., Gill v. Regency Hldgs., LLC*, 2023 WL 4607070, at *20 (Del. Ch. June 26, 2023), *R&R adopted*, 2023 WL 4761810 (Del. Ch. July 25, 2023) (finding "financial statements, profit and loss statements, and general ledgers; copies of tax returns; and documents reflecting the Company's current assets and liabilities" were "necessary and essential to Plaintiffs' valuation purpose"); *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *7 (Del. Ch. Aug. 30, 2016) (finding financial statements, tax returns, and agreements encumbering the company's assets were necessary and essential to valuing stock); *Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *12 (Del. Ch. May 14, 2014) ("The importance of forecasts and projections to valuation of a company is so basic that it does not require citation."); *Dobler v. Montgomery Cellular Hldg. Co., Inc.*, 2001 WL 1334182, at *8 (Del. Ch. Oct. 19, 2001) ("Tax returns, and the information that they contain, can provide valuable insight into the corporation's affairs and, hence, can prove to be both useful and necessary in effectively valuing the minority shares.").[59]

---

vendor." *Id*. ¶ 73. Plaintiff likewise has not demonstrated that this granular information is necessary for valuation.

[59] Plaintiff also seeks "[c]opies of documents and communications sent to other shareholders pursuant to any version (amended or otherwise) of the Investors' Rights Agreement or sent to any noteholder within the past three (3) years through the present." PTO ¶ 80. To the extent such documents are responsive to the requests for financial

Requests 9, 10, 12, 13, and 15 seek information about potential and completed equity and debt investments in the Company; transaction documents for completed financings; marketing materials provided to prospective investors or lenders; and information regarding the 2023 Series B Financing. Plaintiff has reformulated those requests to seek "[t]erm sheets, offers, counter-offers, [or] contracts . . . to purchase Nurture Life or substantially all of its assets"; "[t]erm sheets, offers, counter-offers, [or] contracts . . . to invest[] in or loan[] to Nurture Life"; "[c]opies of all Nurture Life transaction documents for completed financings . . . [including] the transaction documents for the [2023 Series B Financing]"; and "[o]ffering memorandum, prospectus, [or] private placement memorandums . . . drafted or sent by Nurture Life . . . ."[60]  Documents responsive to these requests are also necessary to value Plaintiff's shares and should be produced.[61]

---

information identified above, they should be produced.  But Plaintiff has not demonstrated that all documents and communications sent to stockholders pursuant to the IRA or Amended IRA are necessary and essential to its valuation purpose.

[60] PTO ¶¶ 71-72, 74-75.

[61] Plaintiff also requests "[e]mails and documented or recorded communications of Director Meetings and Actions by Written Consent concerning the issuance of Company securities in the [2023 Series B Financing]."  *Id.* ¶ 78.  Plaintiff has not met its burden to demonstrate that informal communications concerning the 2023 Series B Financing are necessary to value its shares.

Plaintiff also seeks "[a]ll versions (actual or pro forma) of [c]apitalization [t]ables for the past three (3) years through the present."[62]  Plaintiff is entitled to a copy of the Company's current capitalization table, but has not met its burden to demonstrate that all prior versions are necessary to value its shares.

## 2.    Compensation Information

Requests 2 through 4 of the Demand seek information concerning compensation paid to, and promissory notes executed by, Nurture Life's directors, officers, and key employees.

To investigate payments made to Jennifer Chow from the proceeds of the 2023 Series B Financing, Plaintiff is entitled to inspect formal board materials on that topic, including records of promissory notes and loan documents between Nurture Life and Chow.[63]  After reviewing the formal board materials, it may be appropriate for Plaintiff to renew its request for informal materials.

Plaintiff is also entitled to documents sufficient to identify payments made to Nurture Life's other directors and officers.  *See Woods*, 238 A.3d at 900 (explaining that "[a] valuation professional can use this information to make normalizing adjustments to the extent necessary when valuing the firm"); *see also id.* ("More

---

[62] *Id.* ¶ 79.

[63] Plaintiff also seeks "[c]opies of personal guarantees by Mr. Minisini or Mrs. Chow for Nurture Life obligations or indebtedness."  *Id.* ¶ 66.  Nurture Life has represented that no such guarantees exist.  *See id.* ¶ 39; JX 45 (Minisini Dep.) at 100-01.

fundamentally, how directors and senior officers are compensated and whether they are the beneficiaries of any related-party transactions are basic facts that stockholders are entitled to know.").  In addition, Nurture Life must produce a list of the Company's directors and officers.  *See id.* ("A stockholder should be entitled to obtain . . . the identities of its directors and senior officers . . . ."); *KT4 P'rs LLC v. Palantir Techs., Inc.*, 2018 WL 1023155, at *18 (Del. Ch. Feb. 22, 2018) ("[S]tockholders . . . deserve basic information about their investments.  To that end, [plaintiff] is entitled to . . . the identities of directors and officers . . . ."), *aff'd in part, rev'd on other grounds*, 203 A.3d 738 (Del. 2019).[64]

### 3.    The Covered Period

After making the Demand, Plaintiff narrowed its requests to seek documents from the past three years through the present.  Nurture Life has not argued that a three-year time period is unreasonable.  Unless otherwise stated, that time limitation shall govern all categories of documents Nurture Life must produce.

## III.   CONCLUSION

I recommend that the Court enter judgment for Plaintiff as set forth above. This is a final report under Court of Chancery Rule 144(d)(2).  The parties should

---

[64] PTO ¶ 63.  Because Plaintiff has not tied its request for "management organization charts" identifying "key employees" to any proper purpose, that aspect of its request is denied.

meet and confer on a form of implementing order within five days. The stay of exceptions entered under the Chancellor's assignment letter shall remain in place pending entry of the implementing order.